UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

HEATHER STARR

          Plaintiff,

v.

COMMUNITY FIRST CREDIT UNION,

          Defendant.

**COMPLAINT**

Civil Action No.
[Trial By Jury Demanded]

## I.    INTRODUCTION AND NATURE OF ACTION

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Americans with Disabilities Act, as amended by the 2008 Amendments Act (hereinafter "ADA"), 42 U.S.C. § 12101, *et seq.*, and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, to correct unlawful employment practices and to make whole Heather Starr, who has been aggrieved by those unlawful employment practices. Defendant discriminated against and failed to accommodate Ms. Starr because of her sex and disability. When Ms. Starr reported the discrimination she was facing, she was quickly terminated in retaliation for her opposition to sex and disability discrimination.

## II.    JURISDICTION AND VENUE

2. This Court has original jurisdiction in this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5, inasmuch as the matter in controversy is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.

1

Case 1:25-cv-00713-BBC    Filed 05/15/25    Page 1 of 19    Document 1

3. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 12117, and 42 U.S.C. § 2000e-(f)(3) because the events or omissions giving rise to plaintiff's claims occurred in this judicial district.

### III. PARTIES

4. Plaintiff, Heather Starr, is an adult citizen of the United States and a resident of the state of Wisconsin. At all times relevant hereto, plaintiff was employed by the defendant.

5. Defendant, Community First Credit Union ("CFCU"), is a Wisconsin not-for-profit, member-owned, financial cooperative, engaged in business throughout the state of Wisconsin. Defendant CFCU has the capacity to sue and be sued.

### IV. STATEMENT OF FACTS

#### A. Factual Allegations of Sex Discrimination

6. Ms. Starr was hired at Community First Credit Union, Oneida Street Branch, (hereinafter "CFCU") as the Branch Manager on December 10, 2018.

7. Ms. Starr is female.

8. Ms. Starr's spouse is female.

9. Shortly after Ms. Starr was hired, she submitted a personal biography for CFCU's website. Additionally, Ms. Starr's picture and full bio were featured on the homepage of CFCU's internal website, which automatically came up when employees connected to the internet. In her personal bio, Ms. Starr mentioned that she has a wife and daughter. Thus, disclosing her sexual orientation.

10. Almost immediately after Ms. Starr's manager, Cindi Buchli (hereinafter "Ms. Buchli"), learned of Ms. Starr's sexual orientation, Ms. Buchli's treatment of and attitude towards Ms. Starr changed.

11. Through her actions and statements, Ms. Buchli demonstrated that she was uncomfortable with Ms. Starr's sexual orientation. For example, Ms. Buchli would change the subject immediately when Ms. Starr said anything about her wife.

12. Ms. Buchli was not the only member of CFCU to display hostility toward Ms. Starr because of her sexual orientation.

13. Shortly after Ms. Starr's biography was posted, CFCU's Assistant Branch Manager, Mr. Jeremy Hanson (hereinafter "Mr. Hanson") made it a point to state his disapproval of Ms. Starr's sexual orientation, and he continued to remind Ms. Starr that he did not approve of her sexual orientation throughout Ms. Starr's employment.

14. At all times relevant hereto, Mr. Hanson reported to Ms. Starr, and Ms. Starr reported to Ms. Buchli.

15. On one occasion, Ms. Starr was discussing her wife with Mr. Hanson in his office. Ms. Starr set her pink water bottle on Mr. Hanson's desk. When Mr. Hanson realized she had done so, he quickly stuck it in the cupboard, stating that he could not have anything pink visible on his desk because someone might see it and assume he was "that way."

16. On one occasion, Ms. Starr and Ms. Buchli interviewed an applicant for a teller position. The applicant was not heterosexual and openly discussed this in the interview. Ms. Starr found the applicant to be qualified and a good fit. However, Ms. Buchli refused to hire the applicant because CFCU "did not need her type."

17. On another occasion, Mr. Hanson sought Ms. Starr out to inform her of his disapproval of her sexual orientation. He began by explaining to Ms. Starr that he is a devout Christian and that he met his wife during college at a "Christian Campus Crusade." Mr. Hanson

3

went on to inform Ms. Starr that he lives a "Christ-like life at home and at work" and that he would only give Ms. Starr the respect that she "earned."

18. Ms. Buchli and Mr. Hanson's comments and disapproving attitude continued throughout 2019, leading up to CFCU's annual Halloween costume contest.

19. Every year, each branch of CFCU participates in a Halloween costume contest. The branches decide on a group costume, and the employees who wish to participate in the costume contest come to work dressed in their group costume.

20. Ms. Starr's employees were excited to participate in the annual costume contest, and she held a meeting to brainstorm group costume ideas.

21. Many of her employees expressed their desire to participate in the costume contest, but they were reluctant to spend much money on the costumes.

22. Based on her employees' requests to keep the cost down, Ms. Starr suggested that they dress up as a rainbow, which would allow most of her employees to use clothing they already owned to make up the colors of a rainbow. Her employees loved the idea, and plans were made to incorporate an entire sky scene, including, clouds made of cotton balls, a pot of gold made out of tissue paper, and flying birds made from origami and tied to wooden dowels with string.

23. At no point during this costume planning meeting did Ms. Starr raise or discuss the topic of LGBTQ+ rights.

24. At no point during this costume planning meeting did any CFCU employee present at the meeting raise or discuss the topic of LGBTQ+ rights or Ms. Starr's sexual orientation.

25. Mr. Hanson apparently complained to Ms. Buchli about his unfounded opinion that the rainbow costume *must* be a political statement about gay rights because Ms. Starr is a lesbian.

26. Approximately two days after the costume planning was finalized, Ms. Buchli directed Mr. Hanson, Ms. Starr's subordinate, to pull Ms. Starr into the conference room and reprimand her for "forcing the employees to take a political stance on gay rights." Mr. Hanson described Ms. Starr's actions as "irresponsible."

27. Ms. Starr told Mr. Hanson that the sky scene idea, including the rainbow, had nothing to do with gay rights, and pointed out that clouds, pots of gold, and flying birds are not associated with the rainbow that represents gay rights.

28. Ms. Starr further explained to Mr. Hanson that employees seemed excited about the costume idea and, again, emphasized that there was *no* political agenda.

29. Nevertheless, Mr. Hanson informed Ms. Starr, at the direction of Ms. Buchli, that Ms. Starr was prohibited from allowing her employees to dress up as a rainbow.

30. At the direction of Ms. Buchli, via Mr. Hanson, Ms. Starr informed her employees that they were not able to dress up as a rainbow. They were disappointed, but they all worked together to come up with an idea that would allow them to wear the different colored shirts some of them had gone out to buy for the occasion. They ultimately agreed to dress up as crayons.

31. After the branch employees agreed to dress up as crayons, Ms. Buchli pulled Ms. Starr out of a training session and began to chastise her about the crayon costume. Ms. Buchli stated that the crayon costume must be related to gay rights and, therefore, the costume was inappropriate.

32. Ms. Starr explained to Ms. Buchli that she did not feel there was anything inappropriate about dressing up as a crayon and emphasized that the costume idea had nothing to do with gay rights. She also informed Ms. Buchli that she felt that she was being targeted for being a lesbian.

33. Ms. Buchli informed Ms. Starr that she had to email her staff, informing them they did not have to dress up for Halloween.

34. Notably, the Oshkosh South Park branch, also under Ms. Buchli's supervisory authority, dressed up as crayons for Halloween.

35. Ms. Buchli did not intervene or reprimand anyone at the Oshkosh South Park branch for selecting crayon costumes.

36. Ms. Starr, who is a lesbian, was told by Ms. Buchli that a crayon costume was inappropriate because it must be related to gay rights. Simultaneously, the heterosexual branch manager at the South Park branch, who also reported to Ms. Buchli, was permitted to allow her employees to dress up as crayons.

37. The crayon costume idea for the South Park branch was handled differently because of the sexual orientation of the respective managers.

38. Less than a week after Ms. Buchli admonished Ms. Starr relating to the rainbow and crayon costumes, CFCU terminated Ms. Starr in violation of, inter alia, Title VII's prohibition of "sex" discrimination.

39. Ms. Starr endured continuing comments, disapproval, and blatant sex discrimination regarding her sexual orientation throughout her employment at CFCU. This continuing violation, in conjunction with the continuing violations of disability discrimination to which she was subjected, culminated in her discriminatory and retaliatory termination on November 4, 2019.

### B. Factual Allegations of Disability Discrimination

40. In late February 2019, Ms. Starr began to experience significant health problems, which included Ms. Starr passing out at work on a few occasions.

6

41. Ms. Starr's health issues led her to consult several specialists and required a cumulative stay of over two weeks at the Mayo Clinic in Rochester, Minnesota.

42. CFCU was aware of Ms. Starr's health problems and her extended stays at the Mayo Clinic in an attempt to render diagnoses.

43. Her accumulated vacation and personal days fully covered all of Ms. Starr's absences.

44. Ms. Starr was eventually diagnosed with the following conditions: Orthostatic Hypotension; Persistent Postural Perceptual Dizziness; Fibromyalgia; Chronic Fatigue Syndrome; Chronotropic Incompetence; Vasovagal Syncope; Inappropriate Sinus Tachycardia; and Dysautonomia.

45. Her diagnoses required certain reasonable accommodations, which were initially agreed to by CFCU in a meeting with Ms. Starr, Ms. Buchli, and CFCU's Human Resources Officer (hereinafter "HR Officer") on June 24, 2019.

46. One of the reasonable accommodations to which CFCU agreed during the June 24 meeting permitted Ms. Starr to work from the Head Teller room instead of her regular office to reduce the amount that she was required to walk around, as Ms. Starr's office was at the back of the branch, but the Head Teller room was up front. Both Ms. Buchli and CFCU's Human Resources Manager explicitly agreed to this accommodation.

47. Despite this agreed upon reasonable accommodation, on September 4, 2019, Ms. Buchli called Ms. Starr to a conference room, which was visible via glass wall to CFCU employees and patrons of the bank, to inform Ms. Starr that she was being written up for "spending too much time in the Head Teller Office."

7

48. Ms. Starr reminded Ms. Buchli that working from the Head Teller office was one of the reasonable accommodations to which Human Resources and Ms. Buchli agreed during the June 24 meeting.

49. Despite this reminder, Ms. Buchli punished Ms. Starr for her disability and wrote her up for "spending too much time in the Head Teller Office." This admonishment was placed in Ms. Starr's personnel file in violation of the Americans with Disabilities Act.

50. In addition to the above-described event, the other reasonable accommodations agreed upon during the June 24 meeting were not honored by CFCU, including, but not limited to her request for a one-hour lunch break.

51. Furthermore, Ms. Starr was subjected to consistent comments from Ms. Buchli and other CFCU staff who punished her for having a disability.

52. For example, Ms. Starr was informed by the Assistant Head Teller, Ms. Wioletta Reynolds (hereinafter "Ms. Reynolds"), about a conversation Ms. Reynolds had with Ms. Buchli. Specifically, Ms. Reynolds and Ms. Buchli stated that Ms. Starr "would be a great manager if it wasn't for [her] health issues." These are the precise types of comments that the ADA prohibits.

### C. Factual Allegations of Retaliation

53. Less than a week after the Halloween costume incident, Ms. Starr stated to Ms. Hesse that she felt that she was "being targeted because [she] is a lesbian," amid CFCU's continuing discriminatory conduct and comments with regard to Ms. Starr's disability.

54. Chief Human Resource Officer, Ms. Kristy Hesse (hereinafter "Ms. Hesse") terminated Ms. Starr on November 4, 2019.

55. In CFCU's termination letter, one of the reasons provided purporting to justify Ms. Starr's termination was her "[e]xtended periods of time spent working from the Head Teller

8

office," which is the precise accommodation that CFCU deemed "reasonable" and agreed to during the June 24 meeting.

56. CFCU also included several alleged deficiencies in Ms. Starr's performance, about which she was never given warning.

## V. ADMINISTRATIVE EXHAUSTION

57. On August 18, 2020, Ms. Starr filed Charge No. 443-2020-02368 with the Equal Employment Opportunity Commission, and an investigation ensued.

58. On July 29, 2024, the Equal Employment Opportunity Commission found reasonable cause to believe Ms. Starr was discriminated against in violation of Title VII, and that CFCU terminated Ms. Starr in retaliation for engaging in protected activity.

59. A Conciliation process followed but was ultimately unsuccessful.

60. On February 21, 2025, the Equal Employment Opportunity Commission issued a Final Decision and Right to Sue Letter attached hereto as Exhibit A.

61. With exhaustion and all conditions precedent being met, Ms. Starr now exercises her right to file a civil action in the U.S. District Court of Eastern Wisconsin for sex and disability discrimination and retaliation in violation of Title VII of the Civil Rights Act and the Americans with Disabilities Act.

## VI. STATEMENT OF CLAIMS

62. Plaintiff realleges and reincorporates by reference all preceding paragraphs as though fully set forth herein.

**FIRST CAUSE OF ACTION**
**(Sex Discrimination in Violation of Title VII of the Civil Rights Act)**

9

63. Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's sex.

64. Discrimination based on sexual orientation constitutes unlawful discrimination "because of sex" under Title VII.

65. Ms. Starr is a member of a protected class under Title VII on the basis of her sex and sexual orientation.

66. Ms. Starr was subjected to disparate treatment and a hostile work environment on the basis of her sexual orientation. Both Ms. Buchli and Mr. Hanson engaged in ongoing discriminatory behavior and made clear their disapproval of Ms. Starr's sexual orientation.

67. Ms. Buchli instructed Mr. Hanson, Ms. Starr's subordinate employee, to harass, reprimand, and discriminate against Ms. Starr.

68. Mr. Hanson made unsolicited and repeated comments expressing disapproval of Ms. Starr's sexual orientation, invoking his personal religious beliefs and suggesting that Ms. Starr would only be afforded respect if she "earned it."

69. These discriminatory attitudes persisted and escalated throughout Ms. Starr's employment.

70. Despite Ms. Starr's clear and repeated explanation that the costume was unrelated to LGBTQ+ rights, she was berated by management and ultimately prohibited from moving forward with the idea. Even when Ms. Starr and her staff shifted to a different costume idea (crayons), she was again chastised under the same pretext, even though another similarly situated branch under the same managerial authority was permitted to dress up as crayons without reprimand.

71. The defendant's disparate treatment of the Ms. Starr compared to similarly situated heterosexual employees—including the allowance of identical conduct by other branches without consequence—demonstrates clear and intentional discrimination based on the Ms. Starr's sex and sexual orientation.

72. Ms. Starr explicitly informed Ms. Buchli that she believed she was being targeted because of her sexual orientation. Nevertheless, the discriminatory treatment continued, culminating in her termination just days after the incidents concerning the Halloween costumes.

## SECOND CAUSE OF ACTION
### (Failure to Accommodate Ms. Starr's Disability in Violation of Title I of the Americans with Disabilities Act)

73. Defendant failed to provide reasonable accommodations as required by Title I of the Americans with Disabilities Act ("ADA"), despite Ms. Starr's documented disability and specific accommodation requests, which defendant acknowledged and agreed to during a meeting on June 24, 2019.

74. These accommodations included, but were not limited to, a one-hour lunch break, which was denied by CFCU, and permitting Ms. Starr to work from the Head Teller room to limit her walking, a modification explicitly agreed to by both Ms. Starr's Manager and CFCU's Human Resources Manager.

75. Defendant not only failed to implement some and maintain other agreed-upon accommodations, but it also penalized Ms. Starr for utilizing the agreed upon accommodations, including issuing a formal disciplinary write-up on September 4, 2019, for "spending too much time in the Head Teller Office"—a direct violation of the ADA's reasonable accommodation mandate.

## THIRD CAUSE OF ACTION
### (Retaliation for Opposing Sex and Disability Discrimination)

76. Defendant unlawfully retaliated against Ms. Starr in violation of Title I of the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII") for opposing discrimination based on both her disability and her sex, including her sexual orientation.

77. Ms. Starr engaged in protected activity by invoking her right to reasonable accommodations under the ADA and by explicitly objecting to discriminatory treatment on the basis of her sexual orientation—a form of sex discrimination prohibited under Title VII.

78. Rather than addressing the discriminatory conduct, defendant subjected Ms. Starr to escalating adverse actions, including unwarranted discipline, differential treatment, and ultimately termination, on the heels of her complaints and opposition to such unlawful conduct.

79. Specifically, after Ms. Starr reminded Ms. Buchli that her use of the Head Teller room was a reasonable accommodation previously agreed upon pursuant to the ADA, Ms. Starr was written up and reprimanded.

80. Additionally, after voicing concerns that she was being targeted due to her sexual orientation, particularly in connection with the objections to a Halloween costume idea and the disparate treatment between branches, Ms. Starr was further chastised and ultimately terminated less than one week later.

81. As a direct and proximate result of defendant's discriminatory conduct in violation of Title VII and the ADA, Ms. Starr has suffered and continues to suffer damages, including, but not limited to, emotional distress, loss of income, loss of employment benefits, and damage to her professional reputation.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that the Court enter judgment in plaintiff's favor and against defendant, as follows:

1. Order defendant to make Ms. Starr whole by providing appropriate back pay for loss of earning potential plus prejudgment interest on back pay and interest on her pecuniary and nonpecuniary awards, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices;

2. Order defendant to pay compensatory damages for embarrassment, emotional distress, and other non-pecuniary losses;

3. Order reinstatement;

4. Order defendant to pay punitive damages;

5. Order trial by jury on all issues so triable;

6. Grant injunctive relief against the defendant;

7. Grant such further relief as the Court deems necessary and just; and

8. Grant plaintiff her attorney fees and costs pursuant to 42 U.S.C. 2000e-5(k).

Dated at Milwaukee, Wisconsin, this 15th day of May, 2025.

FIRST, ALBRECHT & BLONDIS, s.c.
Attorneys for Plaintiff

s/ Thomas C. Lenz

_____
Thomas C. Lenz, SBN: 1055135
Bryn I. Baker, SBN: 1102534
Kendall Means, SBN: 1122091

Broadway Theatre Center
158 North Broadway, Suite 600
Milwaukee, WI 53202
Telephone: (414) 271-1972

Facsimile: (414) 271-1511
Email: tlenz@fabattorneys.com
bbaker@fabattorneys.com
kmeans@fabattorneys.com

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Milwaukee Area Office**
310 West Wisconsin Avenue, Suite 500
Milwaukee, WI 53203
(800) 669-4000
Website: www.eeoc.gov

## CONCILIATION FAILURE AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: February 21, 2025

**To:** Ms. Heather Starr
934 Mayfield Dr.
Appleton, WI 54911

Charge No: 443-2020-02368

EEOC Representative and email:     SHANNON LEMKE
Federal Investigator
shannon.lemke@eeoc.gov

### CONCILIATION FAILURE OF CHARGE

To the person aggrieved: This notice concludes the EEOC s processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 443-2020-02368.

On behalf of the Commission,

*Amrith Aakre / NK*

Amrith Aakre
District Director

**Cc:**
Community First Credit Union
c/o Litchfield Cavo LLP
Attn: Lynne Mueller
250 E Wisconsin Ave, Ste. 800
Milwaukee, WI 53202

First, Albrecht & Blondis SC
Attn: Kendall Means
Attn: Thomas Lenz
158 N. Broadway Suite 600
Broadway Theatre Center
Milwaukee, WI 53202

Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

**IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT**

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

**ATTORNEY REPRESENTATION**

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

**HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS**

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**<u>To make a FOIA request for your charge file</u>**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 443-2020-02368 to the

District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 443-2020-02368 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.